MICHAEL COOGAN & another *vs.* BURLING MILLS.

Worcester.   Oct. 5, 1877. — May 2, 1878.   ENDICOTT & LORD, JJ., absent.

A deed of mortgage conveyed seven different parcels of land, none of which were described by metes and bounds, but all by reference to other deeds. The first parcel included a mill with the connected water privileges; the seventh the dam about half a mile above, from which the water was conducted through the bed of an old canal to the mill; and the other five lots were between the mill and the dam. The sixth parcel was described as "lying north of the fourth tract and containing two acres to secure water-rights, for a description of which reference is had" to three recorded deeds, the first of which described, by metes and bounds, only the easterly half of a dam and the feeder to the canal, the second described several parcels of land, all by reference to other deeds, among which was a deed also conveying, by metes and bounds, the easterly half of the dam and the feeder, and, in addition, the canal from the mouth of the feeder to the north line of the fourth tract, together with the mill privilege and land then owned by the grantor. The second and third of the deeds referred to, also by reference to other deeds, included the land in controversy and several other tracts of land embraced in other clauses of the mortgage. *Held,* that all the deeds referred to in the sixth clause were to be considered, and that the mortgage included the entire mill privilege.

A., the owner of two mill privileges, used together as one estate, on a river, mortgaged them to T., and subsequently conveyed them to D. subject to the mortgage; and D. raised the lower dam. The mortgage was afterwards foreclosed, and the entire estate conveyed to C., who the same day quitclaimed the upper privilege to A., with the right to divert the water for his mill-privilege from all land owned by C. on the river. At the same time, A. quitclaimed to C. all the estate mortgaged to T., except so much as C. had quitclaimed to A., with the right to maintain the lower dam at the height it was when conveyed to D. C. afterwards conveyed his title to B. *Held,* in an action by A. against B., that B. had the

right to maintain the lower dam at the height it was when C. quitclaimed to A., and that the reference to the height of the dam, in the deed from A. to C., did not restrict this right.

TORT for injuries occasioned by the defendant maintaining its dam at too great a height.    Trial in this court, before *Morton*, J., who, before verdict, reserved the case for the consideration of the full court.    The facts appear in the opinion.

*W. S. B. Hopkins & B. W. Potter*, for the plaintiffs.

*W. W. Rice*, for the defendant.

COLT, J.    The plaintiffs claim to own a mill privilege on Blackstone River, which they say is injured by the back water of the defendant's dam known as the "old feeder dam."    In 1858, the estates of both parties were owned and occupied by the plaintiffs as one estate, known as the "canal mill property," and a mortgage covering the whole, as the defendant contends, but as the plaintiffs deny, was then made to Joseph Thayer. The foreclosure of this mortgage was completed in 1864, and the estate, in 1865, was conveyed by Thayer's quitclaim deed to Henry H. Chamberlin.    On the day of the last named conveyance, Chamberlin quitclaimed to the plaintiffs the estate now owned by them, together with the right to divert the water for their mill privilege, from all land owned by the grantor on Blackstone River, and, at the same time, the plaintiffs quitclaimed to Chamberlin all the estate mortgaged to Thayer "formerly known as the Canal Mill, excepting so much as is quitclaimed this day by the grantee to the grantors, with the right to maintain the dam at the height it was" when it was conveyed, subject to the mortgage, to one Dickenson in 1863, "which is at least as high as the old feeder dam."

The defendant afterwards acquired Chamberlin's title.    It is contended that the back water complained of was caused by the raising of the defendant's dam, being the old feeder dam above named, by Dickenson, when he was in possession in 1863, and that such raising obstructed a mill privilege which the plaintiffs had acquired in 1862, by prior occupancy and use under the mill acts.    But it is plain that, if the mortgage of Thayer covered the plaintiffs' mill privilege, then all rights acquired by them under the mill acts were subject to that mortgage, and were defeated by the foreclosure and subsequent disposition and

use of the property by the owner, because, in the unity of title so acquired, all artificial, as distinguished from natural easements, in favor of different portions of the estate, were merged. The plaintiffs' action must therefore fail, unless, under the second ground relied on, the rights now claimed were granted or preserved to them, by Chamberlin's quitclaim deed in 1865. These two questions are the only ones submitted by this report.

The first question depends upon the construction to be given to the sixth clause of the description in Thayer's mortgage. The estate therein conveyed is described in seven different lots. The first includes the mill, with the water privileges connected. The seventh and last includes the dam, some half a mile above, from which the water is conducted through the feeder and the bed of the old Blackstone Canal to the mill. The other five lots are between the mill and the dam. None of the lots are described in the deed by metes and bounds, but all are described by references to other deeds only. There is no intention manifested in the deed to divide the estate, or to convey any less than the whole mill property.

The description of the sixth parcel declares that "the sixth tract lies northwest of the fourth tract, and contains two acres to secure water-rights, for a description of which reference is had" to three recorded deeds. The first of the deeds referred to describes, by metes and bounds only, the easterly half of the defendant's dam, and the feeder to the canal. The second deed referred to describes several parcels of land, all by reference to other deeds, among which is a deed from Park to the grantor, which also conveys, by metes and bounds, the easterly half of the dam and the feeder, and in addition conveys the canal from the mouth of the feeder to the north line of the fourth parcel above named, together with the mill-privilege and land now owned by the plaintiffs. The second and third deeds, referred to in the sixth clause, also by reference to other deeds, include several other tracts of land, which are embraced in other clauses of the Thayer mortgage.

The plaintiffs contend that the sixth clause should be held to embrace only the land described in the first deed referred to, namely, the half of the dam and the feeder. But we can see no reason for thus restricting the grant to the lot described in

one of the deeds referred to; all the deeds referred to must be taken into account in determining what is conveyed; nor is there any ambiguity created by the fact that several of the lots conveyed are described more than once. It is a mode of description adopted throughout the deed in all its clauses, and seems to have been used in order to make sure that the whole estate of the grantors was covered. It is a settled rule that, although a reference to a recorded deed may not always be construed to exclude a parcel already described by metes and bounds, yet such reference must convey additional land described in the deed referred to, unless otherwise controlled. In this case all the description of the sixth clause, except the statement that the land " contains two acres to secure water-rights," consists in references to recorded deeds, and the rule stated is therefore applicable. *Foss* v. *Crisp*, 20 Pick. 121. *Whiting* v. *Dewey*, 15 Pick. 428. Moreover, unless this be the true construction of this clause, it would follow that there was a tract of land owned by the grantors lying between the mouth of the feeder and the fourth described parcel, through which the water from the defendant's dam was conveyed a distance of thirty rods through the old canal to the mill, which was not conveyed by the mortgage, and which was absolutely necessary to the value of the estate as a mill property.

As to the other question, which relates to the effect of the quitclaim deeds between Chamberlin and the plaintiffs, it is clear that the plaintiffs can derive no title from these deeds to maintain their dam free from the back water, which stood above the bottom of their flume at the time these deeds were made. The water, as it then stood, was caused by the raising of the defendant's dam some two years before. The title of both estates during the last part of that time was in Thayer, who conveyed the same to Chamberlin, and his deed to the plaintiff conveyed no rights beyond those indicated by the actual use and enjoyment of the premises at that time.

The quitclaim deed of Chamberlin, conveying to the plaintiffs their present estate, gave them also a right to discharge water from their privilege through the old canal. But this sentence cannot be construed as giving them a right to discharge into the old canal at a lower level than that at which the water

then was and for some time previous had been maintained. **The**
deed must be construed in this respect by the existing condi-
tion of things. Without something more, it cannot be held to
restore rights which had been lost by unity of ownership. The
owner's actual use and disposition of the property at the time
fails to support the plaintiffs' present claim. The clause in the
plaintiffs' quitclaim deed to Chamberlin, saving the right to
maintain the dam at the height it was when conveyed to Dick-
enson, cannot operate as a restriction on rights acquired by the
foreclosure of the mortgage. The plaintiffs' deed conveyed no
land to Chamberlin, as we have seen, and cannot operate to create
an incumbrance on his estate to the detriment of his grantees,
whatever effect it may have between the parties to it.

*Judgment for the defendant.*